UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

UNITED STATES OF AMERICA     *
    *
    *
              v.     *     CR. NO. 09-0483
    *
MARC J. CURRY     *
         Defendant     *
*******

MEMORANDUM

Defendant Marc J. Curry is charged with possession with intent to distribute fifty grams or more of cocaine and cocaine base. Curry has moved to suppress evidence seized during a traffic stop on July 1, 2009. Docket No. 18.

The Court held a hearing on the motion on July 1, 2010. At the hearing, the Government presented testimony from Wicomico County Deputy Sheriffs Robert Cordrey and J.C. Richardson. The Government also played video-recordings of the traffic stop during the hearing. Curry cross-examined both Deputies but did not present any witnesses.

The Court heard argument on the motion on July 12, 2010. Having carefully reviewed the video-recordings, the parties' briefs, and the hearing transcript, the Court will, by separate Order of even date, DENY the motion.

**I.**      **Background Principles**

Before turning to the issues raised by Curry's motion, a brief review of the law governing traffic stops is in order.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop is a seizure for purposes of the Fourth Amendment. Following the Supreme

Court's decision in Terry v. Ohio, an officer who observes a traffic violation may "detain the offending vehicle for so long as it takes to perform the traditional incidents of a routine traffic stop." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008) (citing Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

The scope of a routine traffic stop is limited. Specifically, "the officer may request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Brugal, 209 F.3d 353, 358 (4th Cir. 2000) (en banc). The computer check verifies routine information including, inter alia, whether there are warrants outstanding against the driver and whether the car has been reported stolen.

Any further detention is "illegal unless the officer has a reasonable suspicion of a serious crime." Id. If the officer develops reasonable suspicion of a serious crime during the course of the stop, he may prolong the stop for the time reasonably necessary to investigate the circumstances.

A routine traffic stop does not authorize the officer to search the vehicle. Under the "automobile exception," however, if a car is "readily mobile" and probable cause exists to believe it contains contraband or evidence of a crime, a warrantless search is permissible. See, e.g., Maryland v. Dyson, 527 U.S. 465, 466 (1999); Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). Assuming probable cause to search the vehicle, law enforcement may conduct a warrantless search "that is as thorough as a magistrate could authorize in a warrant." United States v. Ross, 456 U.S. 798, 800 (1982). A "positive alert" from a drug detection dog provides probable cause to search a vehicle. See United States v. Jeffus, 22 F.3d 554, 557 (4th Cir. 1994); see also United States v. Eura, 440 F.3d 625, 630 (4th Cir. 2006).

A canine scan performed during a routine traffic stop is not a search for purposes of the Fourth Amendment. See Illinois v. Caballes, 543 U.S. 405, 409 (2005). Accordingly, the scan is constitutionally acceptable if performed within the "time reasonably required" to perform the traditional incidents of a routine stop. Id. at 410. In sum, during a routine traffic stop and absent reasonable suspicion, the police may perform a canine scan so long as it does not unreasonably prolong the stop.

## II. The Traffic Stop

Turning to the facts of this case, Deputy Cordrey pulled Curry over at 2:41 p.m. Fogy (pronounced "Foggy"), the canine, made his final alert at approximately 2:57 p.m. Therefore, the stop lasted some sixteen minutes before the scan was complete.

During the interim, Deputy Cordrey called in a computer check of Curry's license and registration. The license and registration came back at 2:46 p.m., confirming that the car was not reported stolen and that there were no warrants outstanding for Curry.

Curry's car had Delaware tags and a Delaware registration. At the hearing, Deputy Cordrey testified that whenever he encounters a temporary tag on a vehicle he has stopped, he "check[s] the VIN to make sure it matches up." Hearing Tr. 50. Deputy Cordrey explained that he invariably performs this check because "[w]e occasionally run into people that have switched tags. They usually take temp [sic] tags and switch them from vehicle to vehicle, and we check to make sure the vehicle's not stolen or someone should be in possession of it that's not allowed to be." Id. at 24. Deputy Cordrey further testified that if the VIN, registration, and tags do not "match up," the VIN or tags could have been altered or the registration could have been falsified. Hearing Tr. 57.

According to Deputy Cordrey's testimony, a VIN check proceeds as follows. First, he obtains the VIN and enters it into his computer. If the system confirms that the car is registered to the driver, the inquiry ends. If the system identifies another person as the car's registered owner, however, Deputy Cordrey calls the owner to verify that the driver has permission to drive the vehicle. If the registered owner states that he sold the vehicle, for example, Deputy Cordrey verifies that the temporary tag and registration match the information provided by the seller.

As discussed above, Curry's car had a Delaware temporary tag. Because Deputy Cordrey's computer could only verify Maryland tags, he called the check in using his radio. Some five minutes later, after Fogy had already made his final alert and the officers were searching Curry's car, the dispatcher radioed back and explained that the VIN was registered to Irene Cooper of Annapolis, Maryland.

### III. Analysis

Curry's motion raises three issues: (i) Whether the canine scan impermissibly prolonged the traffic stop; (ii) Whether the canine's entry into the interior of Curry's car was an unlawful search, and (iii) Whether the recovery of currency from Curry's person violated the Fourth Amendment. The Court will address each of these issues in turn.

#### A. Whether the Traffic Stop Was Unreasonably Prolonged

Curry does not contend that the stop in this case was pretextual. Rather, he argues that the officers unreasonably prolonged the traffic stop to conduct the canine scan. Curry contends that it was unreasonable for Deputy Cordrey to extend the stop after he performed the license and registration check, and that the VIN check was superfluous.

As a threshold matter, the stop in this case lasted for sixteen minutes before Fogy made his final alert. Under the case law, sixteen minutes is an entirely reasonable duration for a

4

routine traffic stop. See, e.g., United States v. Montes, 280 Fed. Appx. 784 (10th Cir. 2008) (unpublished) (15 minute stop during which officer contacted dispatch, discussed defendant's failure to signal, obtained information necessary for citation, learned of defendant's travel plans, and discussed defendant's ownership of vehicle); United States v. Branch, 537 F.3d 328 (4th Cir. 2008) (30 minute stop during which defendant actively misled officer as to identity of car owner); United States v. Mincey, 321 Fed. Appx. 233 (4th Cir. 2008) (unpublished) (35 minute stop during which officer had difficulty verifying defendant's license and had to contact rental car company to determine whether defendant was authorized to drive car).

Curry argues that the stop was unreasonably prolonged because the VIN check was superfluous.[1] Because the overall duration of the stop was reasonable, the Court is disinclined to second-guess Deputy Cordrey's management of the stop. Were the legality of the stop to depend on the VIN check, however, the Court concludes that the stop was not unreasonably prolonged.

Deputy Cordrey testified persuasively that it is his regular practice to run the VIN number of every car he stops that has temporary tags. Such was his training and the regular procedure of other officers, he also stated. Deputy Cordrey also explained that this particular VIN check required him to radio dispatch because he could not verify the Delaware temporary tags on his in-car computer.

In short, Deputy Cordrey followed a regular police practice to determine who the registered owner was and whether Curry was authorized to drive the vehicle. The VIN check was a traditional incident of a routine stop made under these circumstances. Because the check did not come back until after Fogy made his final alert, the stop was not impermissibly prolonged.

---

[1] Curry acknowledges that verifying ownership is an essential element of a traffic stop. He argues that the VIN check was unnecessary because Deputy Hamilton, who was present at the stop with Deputy Cordrey, had reviewed a Bill of Sale for the vehicle.

5

Because the Court finds that the stop was reasonable in duration, it is not necessary to address Curry's argument that the scan was not supported by reasonable suspicion.

**B.      Whether the canine's entry into the car was an unreasonable search.**

Curry argues that by jumping into the open driver's door, Fogy searched the car without probable cause and in violation of the Fourth Amendment. Curry relies on two cases from the Tenth Circuit: United States v. Stone, 866 F.2d 359 (10th Cir. 1989), and United States v. Winningham, 140 F.3d 1328 (10th Cir. 1998).

In Stone, the dog jumped through a car's hatchback, which had been left open by the defendant, and sniffed the car's interior. The court held that the dog's "instinctive actions" did not violate the Fourth Amendment because the police did not ask the defendant to open the hatchback so the dog could jump in, nor did the police handler encourage the dog to jump in. Id. at 364. Rather, the handler testified that "I just let his leash go and let him go where his nose would take him." Id.

By contrast, in Winningham, the officers opened the door, allowing the vehicle to sit on the side of the highway for at least six minutes until the drug dog could arrive. The dog handler also unleashed the dog as it neared the open door. The court held that the dog sniff was a search because the officers acted with a "desire to facilitate a dog sniff of the van's interior." 140 F.3d at 1331.

In this case, Deputy Richardson, an experienced canine handler, performed the canine scan. Following office policy, he ordered Curry out of the car for the duration of the scan.[2] As Curry exited the vehicle, the door was left open.

---

[2] Deputy Richardson explained that this policy prevents suspects from driving from the scene or being bitten accidentally by the dog.

Approximately one minute later, Deputy Richardson walked Fogy to Curry's car. Fogy began his scan at the rear of the car, on the driver's side. Deputy Richardson testified that Fogy alerted almost as soon as he approached the car. Namely, Deputy Richardson pointed to Fogy's closed mouth, raised tail, and changed posture as signs that Fogy immediately detected narcotics in Curry's car. Fogy continued to exhibit these signs as he circled the car counter-clockwise.

Deputy Richardson testified that Fogy is trained to get as close to the source of the narcotics odor as possible. Accordingly, when Fogy approached the open door, he jumped inside the car for a few seconds. He then emerged and sat, indicating a final alert.

In sum, the video recordings and Deputy Richardson's testimony establish that Fogy had alerted before he jumped into the car. Fogy's initial alert provided the officers with probable cause to search the vehicle. When Fogy approached the open door, he instinctively jumped inside the car to get as close as possible to the narcotics he had detected. There is no evidence that Deputy Richardson or any of the other officers acted with a desire to facilitate Fogy's sniff of the interior. Given these facts, Fogy's entry into the car was not a search in violation of the Fourth Amendment.

### C. Whether the seizure of currency from Curry's person violated the Fourth Amendment.

After Fogy made his final alert, the officers frisked Curry and removed approximately $1,000 in cash from his person. When the officers recovered the cash, they had not yet recovered the narcotics from the car or placed Curry under arrest. Therefore, Curry argues that this seizure was in violation of the Fourth Amendment.

The Court will assume arguendo that the seizure was made without probable cause to arrest or search Curry. Under the "inevitable discovery" doctrine, however, improperly seized evidence may nevertheless be admissible "[i]f the prosecution can establish by a preponderance

7

of the evidence that the information ultimately or inevitably would have been discovered by lawful means." <u>Nix v. Williams,</u> 467 U.S. 431, 444 (1984).

Here, Fogy alerted to the narcotics before the officers seized Curry's cash. Having observed Fogy's alert, the officers obtained probable cause to search the car. When the officers located the narcotics in the passenger side glove compartment, they immediately placed Curry under arrest and performed a search incident to his arrest. This search would have uncovered the cash had it not been seized moments before. Given these facts, the government has met its burden to establish that the cash would inevitably have been discovered by lawful means.

**IV.     Conclusion**

For the reasons stated herein, the Motion is DENIED. A separate Order follows.


Dated, this 16th of July, 2010.                               /s/
                                                                   Benson Everett Legg
                                                                   United States District Judge